UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FORM PORTFOLIOS LLC, | |
| Plaintiff, | Case No. |
| v. | COMPLAINT AND JURY DEMAND |
| FOOD52, INC., | |
| Defendant. | |

Plaintiff Form Portfolios LLC ("Form") hereby alleges as and for its Complaint against Defendant Food52, Inc. ("Food52"):

## I.    SUMMARY OF THE ACTION

1.    Form is a company created in 2016 to own and manage designs by designers and to create partnerships with design brands interested in licensing these designs to produce and sell these products.  Form brings this action to enforce three contracts with Food52, owner of the Dansk brand, which Food52 has elected to breach merely because it has replaced the management team that made the commitments a year ago.  Starting in November 2023, Food52 ceased making payments owed to Form under the agreements, including past due royalties and licensing payments that exceed $610,000.  Form has suffered damages in excess of $10 million due to Food52's unexcused attempt to terminate the agreements.

2.    Dansk is an iconic kitchenware provider, dating back to the 1950s.  For the past two decades it has been stagnant due to limited product offerings, filing for U.S. bankruptcy protection, and undergoing several ownership changes.  Its current owner, Food52, acquired Dansk in 2021, and hired Alex Bellos as its new CEO.  Mr. Bellos's plan for

Dansk was to revitalize its brands by expanding its products beyond kitchenware.  In pursuit of his new vision, Dansk contacted Form, which maintained a longstanding relationship with the heirs of Dansk's most iconic product designer, Danish designer Jens Quistgaard ("Quistgaard").  Food52 sought to collaborate with Form on Dansk's new plan, entering into three separate agreements: a January 2023 Form License Agreement ("FLA"), a July 2023 Support and Participation Agreement (the "SPA"), and a July 2023 Dansk License Agreement ("DLA") (collectively, the "Agreements").  Evidencing the long-term collaborative view, the SPA and DLA provided for initial seven-year terms, over which Food52 agreed to pay Form fees, royalties and profit participation totaling at least – but likely in excess of – $10 million.

3.      Form performed all of its contractual obligations to positive reviews from Dansk. However, in December 2023, shortly after engaging Form, Food52 replaced Mr. Bellos due to "internal strife" at Food52 concerning its ambitious business strategy.  In a dramatic shift, Dansk chose Barstool Sports CEO Erika Badan to replace Mr. Bellos.  Mr. Bellos's plan to expand Dansk into furnishings and other homewares was replaced by Ms. Badan's plan to focus on creating content for Food52's social media platforms.  Less than a year into the seven-year term, Dansk acknowledged that while Form's performance was "working well," and that the Form team had "formed a strong creative partnership," Food52 nevertheless asked Form to reduce the compensation it was promised in the Agreements. When Form declined, Food52 stopped making any payments. It then engaged counsel to fabricate a pretextual justification for terminating Food52's long-term commitments.

4.      On June 10, 2024 – months after Food52 had already breached its obligations to Form by nonpayment – Food52 sent a termination notice that is utterly without legal or factual basis.  Food52 put forth a hodge-podge of excuses – that Mr. Bellos was acting without Food52 Board approval and without involvement of its legal counsel.  In fact, Food52's owner, the private equity firm TCG Capital Management LP ("The Chernin Group"), approved the Dansk business plan, and Food52's outside legal counsel edited the Agreements.  Food52's conduct also is entirely inconsistent with the claimed termination, as the Agreements provide that upon termination of the licenses *for any reason*, Food52 must cease offering the licensed designs and licensed products, and cease using licensed trademarks. In disregard of that obligation, Food52 continues offering the defined products and is using the trademarks without legal authority.

5.      In short, Food52 has blatantly sought to gin-up an excuse to walk away from indisputable obligations merely because its new management does not like the commitments made by its prior management.  That is a wholly insufficient basis for ignoring sacrosanct legal commitments.

## II.      JURISDICTIONAL ALLEGATIONS

### A.      Parties

6.      Plaintiff Form Portfolio LLC is a Limited Liability Company formed under the laws of the State of Delaware.  Its principal place of business is in Providence, Rhode Island.

7.      Form licenses trademarks and related intellectual property relating to mid-century and modern design products including home and office furniture, lighting, textiles, tableware and accessories.

8.     Defendant Food52, Inc. is a corporation formed under the laws of the State of Delaware. Upon information and belief, its principal place of business is 1 Dock 72 Way, 13th Floor, Brooklyn, NY 11205.

9.     Upon information and belief, Food52 was founded in 2009 by Amanda Hesser and Merrill Stubbs.

**B.    Jurisdiction and Venue**

10.    This action arises under the trademark and anti-dilution laws of the United States, 15 U.S.C. § 1051, et seq. This Court has subject matter jurisdiction at least under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2), as it is a judicial district in which the Food52 resides and also the district in which a substantial part of the events or omissions giving rise to the claim occurred.

12.    The Court has personal jurisdiction over Food52 in that it resides in this district, and has marketed the infringing materials in the district.

### III.    FACTUAL ALLEGATIONS

**A.    Dansk's Changing Corporate Ownership**

13.    Dansk was founded in 1954 and is a longstanding brand known largely for its Scandinavian-designed cookware, tableware, and other home accessories.

14.    Upon information and belief, following a 1985 buy-out by Goldman Sachs, Dansk was acquired in 1991 by the Brown-Forman Corporation and incorporated under its Lenox subsidiary.

15.    Upon information and belief, on March 16, 2009, Clarion Capital Partners LLC
purchased the assets of Lenox—including Dansk through a bankruptcy proceeding.

16.    Upon information and belief, Lenox was acquired by private equity firm Centre Lane
Partners in October 2020.

**B.    The History of Dansk's Collaboration with Jens Quistgaard**

17.    Dansk was known largely for products designed by Jens Quistgaard, a Danish craftsman
and designer.

18.    Dansk tabbed Jens Quistgaard as its chief designer starting in 1954 and continuing for the
following three decades.  Mr. Quistgaard died on or about February 2, 2008.

**C.    1992 Agreement**

19.    Upon information and belief, by a Design Agreement dated December 16, 1992, Dansk
International Designs, Ltd. and Mr. Quistgaard entered into a written agreement with
respect to Dansk's rights in Quistgaard's work.  By the agreement, Quistgaard would
continue to submit designs to Dansk, which had the right to accept or reject the designs.
Quistgaard retained all rights for designs not accepted by Dansk.

20.    The 1992 agreement provided Dansk with a limited license to utilize Quistgaard's
distinctive and famous name, signature, biographical data, photograph and/or likeness on
the accepted designs.

**D.    2012 Agreement**

21.    In March 2012, Dansk, through its parent company Lenox Corporation, and Qubra ApS,
a Danish company owned by Jens Quistgaard's heirs, Henriette Quistgaard and Therese
Quistgaard, entered into a Design Agreement.

22.    In substance, the 2012 agreement provided Dansk a right of first refusal to certain
archival designs by Quistgaard, including tabletop products, cookware, furniture,

4

lighting, linens, and gifts, that had not been marketed by Dansk under the 1992 agreement.

23.    The 2012 agreement provided Dansk with a limited license to utilize Quistgaard's name, initials, signature, biographical information and likeness for promotional materials only with respect to the additional accepted designs, and to affix the same to such products.

24.    The 2012 agreement had an initial term of 10 years. Upon information and belief, the 2012 agreement expired in 2022.

**E.    Food52's 2021 Attempt to Revive the Dansk Brand**

25.    Upon information and belief, Food52 developed a relationship with the Dansk brand to offer the Dansk products through the Food52 web site.

26.    In 2019, Stubbs and Hesser sold a majority stake in Food52 for $83 million to the private equity firm TCG Capital Management LP, known as "The Chernin Group" (hereinafter "TCG").

27.    In May 2021, Food52's owners, TCG, provided capital for it to acquire the Dansk brand from Centre Lane Partners. TCG's investment in Food52 was managed by Mike Kerns, President of Digital at TCG.

28.    Upon information and belief, the Dansk acquisition was a part of TCG's aggressive expansion plan:

> TCG doubled down on its [Food52] investment, pouring another $80 million into the business, some of which Food52 used to acquire Scandinavian heritage cookware brand Dansk and Portland, Oregon–based whole-home brand Schoolhouse. In 2022, the company began work on a new 42,000-square-foot headquarters in the Brooklyn Navy Yard.

https://businessofhome.com/articles/food52-announces-layoffs

29.     Upon information and belief, one component of Food52's business plan was to relaunch

Dansk's products beyond its kitchenware offering by licensing other designs from

Quistgaard's archives, as well as designs by other designers:

> Food52 plans to make Dansk a mainstay of modern living known around the world. In addition to the designs already available in its Shop, Food52 will re-imagine the line: revitalizing the core heritage products, relaunching gems from the extensive archives, and developing new Dansk designs, including the classics made with updated materials and limited-edition collections by top international designers.

https://www.businesswire.com/news/home/20210503005524/en/Food52-Acquires-Dansk-Plans-to-Revitalize-the-Heritage-Home-Brand

30.     Food52's goal was repeated in its public comments:

> The new owners approach the acquisition as a type of historical revival project—keeping in mind what steps are required in order to make the brand last for another 70 years. The plan is three-pronged: Expand upon the color and size assortment of core heritage products, reissue select archival designs, and introduce fresh Dansk designs in limited-edition collaborations with partners to help continue Dansk's legacy. To oversee the undertaking, Hesser has tapped Christine Muhlke, brand strategist and founder of food consultancy Bureau X, who also held editorial posts at *Bon Appètit* and the *New York Times Magazine*.
>
> ….
>
> Take the maker's best-selling Kobenstyle line, for example. Only a fraction of the designs in the original collection are still in production today. "I'd love to reintroduce some of the pieces that still feel so fresh and forward-thinking today to add depth and breadth," Muhlke explains. "[The company was] doing $33 million a year in business in 1983. It was a much bigger range, so I'd love to go back in and see what was leading in the '80s that dropped out."

https://www.architecturaldigest.com/story/food52-acquires-dansk-plans-for-the-danish-homeware-brands-revival

31.     To lead its aggressive plan, on September 15, 2022 Food52 announced that it had hired

Mr. Bellos to be its co-CEO and board member.

32.     Mr. Bellos had long experience in home furniture and lighting design as President of

West Elm for the prior ten years.  West Elm does $2.2 billion of annual sales and is

owned by the William Sonoma Group Inc. and Mr. Bellos was one of its most-senior executives.

33. One of Mr. Bellos's top priorities at Food52 was to expand the Dansk brand beyond kitchenware to include a broad collection of furniture and other home wares based exclusively on Scandinavian designs.

**F.    Food52's First Licensing Agreement with Form**

> **i.    The January 2023 Licensing Agreement with Form for Designers Suppanen, Curry and Mergentime**

34. Form holds the right to license certain designs created by three designers – Ilkka Suppanen, Bill Curry, and Marguerita Mergentime.

35. Form and Food52 agreed to a license agreement, the FLA, as amended, with an Effective Date of January 11, 2023, for these designers to be sold under Food52's Schoolhouse brand.

36. This was part of Mr. Bellos's strategy to license design rights to have exclusive products.

37. By the FLA, Form granted Form52 an exclusive license to make, have made, use, offer to sell and sell, import, promote, and distribute the Suppanen, Curry and Mergentime Licensed Products using Licensed Trademarks.

> **ii.    The July 2023 Support and Participation Agreement**

38. Form has an office in Denmark, Danish-speaking employees, and a relationship with the Quistgaard family.

39. In the January discussions, Mr. Bellos raised the issue of Food52's expansion plan for Dansk and stated that Quistgaard designs were a critical part of Food52's strategy.

40. Food52 had acquired certain rights to Quistgaard's designs under Dansk's and Lenox's prior 1992 and 2012 agreements with the Quistgaard family.

41.    However, Mr. Bellos acknowledged to Form that, upon reviewing these agreements in

2023, Food52 discovered that its 2012 agreement with the Quistgaard family's company

(Qubra), had expired in 2022, and that Food52 had failed to timely invoke its right to

continue that agreement and thus lost its right of first refusal on designs in the Quistgaard

archives.  This could have resulted in Quistgaard designs being offered by Dansk's

competitors.  Mr. Bellos therefore advised that Dansk's rights with respect to the

Quistgaard collection were uncertain and required a new agreement to clarify the rights

and gain access to the designs in the Quistgaard archives.

42.    Upon information and belief, in early 2023, Mr. Bellos and Food52's outside lawyers at

Reitler Kailas & Rosenblatt LLP proposed a new agreement with Quistgaard's family.

43.    Upon information and belief, the Quistgaard family rejected the new agreement, was not

inclined to work with Dansk directly, and rejected Food52's overtures.

44.    Having failed to achieve a new agreement directly with the Quistgaard family, Mr. Bellos

asked Form to act as an intermediary because of its expertise in working with the families

of designers such as Quistgaard.  He wished to have an arrangement whereby all of

Food52's communications with, and payments to, the Quistgaard family and Qubra

would be through Form and for Form to lead the research of the Quistgaard archives for

designs that would be suitable for Dansk and its expansion plan. In an April 14, 2023

meeting, he told Form that Food52 was keen to partner with Form and that they "want to

move quickly" on the Dansk plan.

45.    Form addressed the Quistgaard family, which agreed to permit Form to negotiate its

rights with respect to Dansk.  On May 9, 2023, Form and Qubra entered into a

collaboration agreement (the "Collaboration Agreement").  By that agreement, Qubra

agreed to collaborate with Form because of Form's design expertise, network of brands and reputation for elevating the legacies of designers with whom it works. Qubra granted Form the exclusive right to negotiate with Dansk, on its behalf, a new license agreement that would replace the previous Dansk design agreements. By Section 3 of the Collaboration Agreement, Form is Qubra's legal representative, as Qubra has granted Form the right to take action to terminate unauthorized use of Quistgaard's trademarks.

**G.    The Chernin Group Approves Dansk Plan and Form Arrangement**

46.    With the agreement between Qubra and Form in place, on May 16, 2023, Mr. Bellos and Form began discussions of their business arrangements going forward. Mr. Bellos proposed that Form assist in the relaunch of Dansk.

47.    Both agreed to the concept of a "virtual" joint venture by which Form would provide creative services to Dansk, while Food52 would focus on merchandizing the products to the public.

48.    This new relationship would be in the form of a Support and Participation Agreement.

49.    Upon information and belief, in late May 2023 Mr. Bellos presented the Dansk business plan and proposed arrangement with Form to Food52's board and investors.

50.    Upon information and belief, Mr. Bellos, Ms. Hesser and the Food52 Chief Financial Officer flew to Los Angeles on or about May 29, 2023 and presented to TCG, at the TCG offices, Food52's business plan to develop the Dansk brand. TCG's co-founder Peter Chernin, attended, as did TCG partners Jesse Jacobs and Mike Kerns, along with Erika Badan, who was the CEO of Barstool Sports (a prior TCG investment), and was advising TCG with respect to the Food52 investment.

51.    Food52 Board members, including, upon information and belief, Ms. Badan, and TCG approved Mr. Bellos's vision for Dansk, and the proposed arrangement with Form.

52.    From May 2023 to July 2023, Food52 and Form negotiated the SPA.  Food52 was advised by legal counsel, Reitler Kailas & Rosenblatt LLP.

53.    The SPA was finalized on July 17, 2023.

54.    The SPA had a term of seven years from its July 2023 effective date.

55.    The SPA recited its purpose to have Form combine existing Dansk (Food52) designs with new designs from Form to create a Dansk Collection consisting of existing designs and new designs:

> WHEREAS, each of Food52 and Form desire to commence an ongoing collaboration in order to create a collection of Scandinavian design products for the entire home under the Dansk brand using both existing Food52 designs and Form designs (such collection of existing and newly-created Dansk-branded products, the "Dansk Collection"), and will license certain designs to Food52, create certain designs for Food52 and be the primary provider to Food52 of valuable development and support services in creating and marketing of the Dansk Collection, on the terms and conditions set forth herein

56.    For its services, Form was entitled to receive a base fee of $100,000 per quarter. SPA § 5.1.

57.    In addition, Form was entitled to receive a participation right in respect to Dansk's gross profits, payable for each calendar quarter. SPA § 5.2. As relevant here, the participation right for the first $100,000,000 in Net Sales was payable at a rate of 15% of the gross profits of the sale of all Dansk Collection products.

58.    Food52 recognized that the 1992 and 2012 agreements with the Quistgaard family were insufficient to enable Food52's new planned expansion.

59.    Therefore, the SPA also contemplated a new license agreement to replace the existing agreements and providing Food52 with rights to designs in the Quistgaard archives as well as for designs by other designers.

10

60.     In a recital inserted by Food52's legal counsel, RKR, Food52 refers to its prior agreements with Quistgaard, stating that "Food52 owns the heritage brand 'Dansk' and licenses certain designed used by Dansk pursuant to various intellectual property licenses, including but not limited to designs by Jens Quistgaard/Qubra… referred to collectively as the 'Existing License Agreements'."

61.     The SPA then recites that the parties contemplated that they would be negotiating a New License Agreement by which "(i) certain of the Existing License Agreements pertaining to designs by Jens Quistgaard and/or Qubra that are exclusively managed by Form shall be consolidated and updated (with respect to date, duration, price and other terms), and (ii) Form will license numerous additional designs created by Jens Quistgaard and additional designs by multiple other designers, and trademarks related to such designers, to Food52….."..

## H. The August 2023 Dansk Licensing Agreement for Quistgaard and Seventeen Other Designers

62.     The parties proceeded to create the new license agreement, titled the DLA.

63.     The DLA recites that Food52 "owns the heritage brand 'Dansk', selling primary cookware and tableware products in North America, including products using certain Quistgaard designs that were previously licensed pursuant to the Prior Agreements (as hereinafter defined.)"

64.     Section 1.9 defines the "Prior Agreements" as: (i) the Design Agreement, dated December 16, 1992, between Dansk International Designs, Ltd. and Jens. H. Quistgaard; and (ii) the Design Agreement, dated March 22, 2012, between Lenox Corporation, dba Dansk International Designs, and Qubra."

65.   The DLA was intended to constitute a uniform and sole agreement with respect to these Licensed Designers: "Licensee acknowledges and agrees that (i) this Agreement supersedes and replaces the Prior Agreements and the Prior Agreements are of no further force or effect; (ii)  other than the license to the Licensed Designs granted to Licensee pursuant to this Agreement [DLA], Licensee holds no other rights with respect to designs or other intellectual property of the Licensed Designers.

DLA Section 4.5.

66.   The DLA license encompassed designer Quistgaard, as well as additional designers Steen Ostergaard, and Robert Wengler (defined in the DLA as the "Licensed Designers") and, with a subsequent amendment, Food52 secured rights to over 600 designs by 18 different Scandinavian designers.

67.   The definition of Licensed Designs is found in DLA Section 1.1:

"Form IP" shall mean all designs, models, prototypes, drawings, blueprints, material specifications and the like furnished by Form to Licensee hereunder relating to the design of the product or products identified in The Appendices and collectively referred to herein as "Licensed Designs".

68.   DLA Section 1.10 confirms that "Licensed Designs" "consist[s] of Appendix A.1a (Quistgaard currently in production as of the Effective Date), Appendix A.1b (Quistgaard on order and in development Kobenstyle), Appendix A.1c (Quistgaard all remaining table top designs), Appendix A1.d (Quistgaard furniture), Appendix A.2 (Steen Østergaard) and Appendix A.3 (Robert Wengler), as the same may be amended or supplemented from time to time."

69.   The DLA was Amended in November 2023 to encompass an additional fifteen designers.

70.    In addition to the license fees, the DLA also entitled Form to receive a yearly fee of $40,000 for providing the modification of design services set forth in Section 6 of the DLA, in the event that the SPA was terminated *for any reason*.

71.    Addressing the rights to the property after the DLA termination, the parties agreed that:

> Upon termination of the Agreement for any reason, and subject to Licensee's right to sell inventory pursuant to Part 11.2(d) hereof, Licensee agreed that thereafter it will (i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) cease using Licensed Trademarks for any purpose.

DLA Section 4.5.

72.    By Section 7.3, Food52 also committed that "[a]ny trademark, other than Licensee's house mark or brand, that is adopted by Licensee in marketing Licensed Products in addition to a Licensed Trademark that becomes associated exclusively with any or all Licensed Products as a result of such marketing, shall revert to Form upon termination of this Agreement for any reason."

73.    The DLA Section 8.4 set forth projected launch dates for the new products licensed by Form under the DLA, and provided that if Food52 failed to launch the design within six months of that date, it would pay Form $5,000 per design to terminate the DLA with respect to that product.

**I.    Mr. Bellos Loses Power Struggle and Leaves Food52 in December 2023**

74.    Upon information and belief, TCG holds a majority ownership interest in Food52.

75.    Upon information and belief, Barstool Sports was another one of TCG's portfolio companies. Barstool Sports is a sports, comedy, and pop culture digital media brand.

76.    Ms. Badan was Barstool Sport's CEO, and also served on the Food52 Board.

77.    Upon information and belief, TCG brought Ms. Badan in to oversee Food52, and "Badan acted as an unofficial advisor to the commerce-meets-content site, eventually joining its board in the summer of 2023."

https://businessofhome.com/articles/food52-names-former-barstool-sports-chief-erika-badan-as-ceo

78.    However, unbeknownst to Form, Ms. Badan's appointment reflected an apparent power struggle within Food52.

79.    Ms. Badan viewed Food52 as primarily a digital media company, and apparently did not share Mr. Bellos's vision to expand the Dansk brand into a homewares company.

80.    Ms. Badan apparently won the brief power struggle at Food52.  In December 2023, Food52 announced that Mr. Bellos was leaving the company.

> Content-meets-commerce juggernaut Food52 is undergoing an executive shake-up: After just over a year in the top spot, CEO Alex Bellos is out. His departure was announced in an all-hands meeting with employees today. "Alex has stepped down as CEO—we're grateful for his contributions to the company," Food52 co-founder and executive chair Amanda Hesser tells Business of Home. "We have a strong management team and transition plan in place, and a search is underway for a new CEO to lead our excellent brands."

> The company has not named a replacement, though a source with knowledge of the situation said that Barstool Sports CEO Erika Badan—who sits on Food52's board—will help with the transition.

https://businessofhome.com/articles/food52-ceo-alex-bellos-steps-down

81.    In April 2024, Food52 appointed Ms. Badan as its CEO:

> It's change at the top once again for Food52. Four months after the abrupt departure of Williams-Sonoma veteran Alex Bellos, the company—which owns Schoolhouse and Dansk—has a new CEO: Erika Ayers Badan, the former chief executive of media brand Barstool Sports.

https://businessofhome.com/articles/food52-names-former-barstool-sports-chief-erika-badan-as-ceo

**J.      Ms. Badan's Cost-Cutting Plan**

82.     One of Ms. Badan's first steps was to cut costs by firing employees and cutting the

product development pipeline.

83.     In February 2024, Food52 fired 22% of its workforce.

> Late last year, Food52 announced that West Elm veteran Alex Bellos would be
> stepping down as CEO after less than a year in the top spot. Today, the
> commerce-meets-content platform is announcing a round of layoffs: 45
> employees will be let go across the flagship site as well as its owned brands,
> Dansk and Schoolhouse. The cuts amount to 22 percent of Food52's total
> headcount.

https://businessofhome.com/articles/food52-announces-layoffs

84.     Food52 also stopped paying Form's invoices. Starting in November 2023, Food52 ceased

making payments owed to Form under the agreements, including royalties and licensing

payments that, as of today, exceed $610,000.

**K.      New Management's March 2024 Attempt to Renegotiate the Agreements**

85.     Ms. Badan next turned her attention to attempting to shed the million-dollar contractual

obligations fixed to the Dansk expansion plans developed under Mr. Bellos's leadership.

86.     Food52 and Form worked collaboratively on performing the above-referenced

Agreements with a shared understanding of their respective rights and obligations.

Food52's March 2024 presentation by Ms. Badan on the relationship makes clear that

Form's performance was "working well," but that it was purely the economics of

Food52's payment obligations that was a concern.

**Dansk + Form:**

Already, a lot is working well:

- There's a mutual understanding of the unique value of the Dansk brand
- Amanda and Peter have formed a strong creative partnership and have aligned on a new brand identity and marketing
- Camilla has done a great job building important designer relationships for us in Scandinavia
- We both have great respect for the early Dansk designers and a desire to make sure their work is reproduced respectfully and launched successfully so that their royalties will grow
- The royalties are proving fruitful, and we're just at the beginning

What's not working:

- Duplication of fees with 400K retainer, billed consultants and 15% GP share
- Not covering COGS with low allocation amounts

87.     The presentation confirms that Food52's issues were simply about Form's fees.  Its subsequent attempt to renegotiate those fees upon Ms. Badan becoming the CEO shows the real impetus for Food52's sudden effort to avoid the Agreements.

**L.     Food52's June 10, 2024 Repudiation and Material Breach of the Three Agreements**

88.     When Form declined Food52's request to renegotiate the financial terms of the agreements, Food52 sought pretexts for terminating the agreements.

89.     On June 10, 2024, Food52's outside counsel, Locke Lord LLP, sent a letter to Rosemary L. Dooley, Esq., purporting to terminate the DLA, the SPA, and even the FLA, which applied to designers licensed to School House and Food52 – an agreement that predated any discussions about Dansk.

90.     The primary contention in Food52's letter was that it was under "incorrect assumptions concerning the prior design agreements with the Quistgaard family and ownership of the intellectual property rights."

91.     Food52's purported termination letter falsely states that the FLA, SPA and DLA were not reviewed by Food52's lawyers and not approved by its Board.

92.     The DLA was specifically intended to supersede Food52's existing two agreements with the Quistgaard family, with Section 1.9 directly defining the prior agreements to be "the

(i) the Design Agreement, dated December 16, 1992, between Dansk International Designs, Ltd. and Jens H. Quistgaard; and (ii) the Design Agreement, dated March 22, 2012, between Lenox Corporation, dba Dansk Internationa [sic] Designs, and Qubra."

93.     Stated more starkly, Food52 contends that Food52's well-respected CEO Mr. Bellos, its lawyers, and its Board of Directors (including Ms. Badan) and the majority shareholder, TCG, and its lawyers never even looked at those prior agreements between Dansk and the Quistgaard family – either as part of:

a.     Due diligence preceding TCG's 2019 investment of $83 million to acquire 100% of Food52, which, since 2017, was offering the Dansk products on its website, or

b.     Due diligence preceding TCG's additional $80 million investment in 2021 to fund the Dansk acquisition, or

c.     Food52's three-months of discussions with the Quistgaard family in early 2023 about restructuring those existing agreements, or

d.     The seven months of discussions with Form about creating a new license agreement to replace the existing 1992 and 2012 agreements.

94.     By a June 17, 2024 response, Form stated that Food52's purported termination was without merit, and sent Food52 its own notice that Food52 was in material breach of the agreements, and provided it the opportunity to cure the breach within the Agreements' 60-day cure period by withdrawing the purported termination.

95.     Food52 failed to cure and withdraw the purported termination, and has now materially breached and repudiated all three agreements.

**M.    Food52's Continued Post-Termination Sales in Violation of the DLA and Trademark/IP Rights**

96.    In order to preserve the designers' rights, the DLA and FLA each contained provisions ensuring their rights if the licenses were terminated.

97.    Food52 (a) made a separate contractual obligation to cease making and offering to sell any Licensed Products and cease using the Licensed Trademarks upon termination of the licenses, and (b) acknowledged and agreed that upon termination of the license, it would *no longer hold any intellectual property rights* to the "Licensed Designers," which includes Quistgaard.

98.    Both the DLA and FLA contain a provision, § 11.1(b), by which Food52 agreed as follows:

> (b) Upon termination of the Agreement for any reason, and subject to Licensee's right to sell inventory pursuant to Part 11.2(d) hereof, Licensee agrees that thereafter it will: (i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) cease using Licensed Trademarks for any purpose."

DLA Section 11.1(b); FLA Section 11.1(b)

99.    Licensed Products are defined in each license section 1.5 as meaning "the products or product types specified in the Appendices…."

100.    The DLA Appendices specified the subject "Licensed Products" by SKUs and with photographs, an example of which is depicted below:



(DLA Appendix A.1a)

101.    "Licensed Trademarks" are defined in DLA Section 1.2 as:

> "Licensed Trademarks" are set forth in Appendix B attached hereto and shall include the name of the designer in question, their likenesses, signatures, logos and initials for use in connection with the promotion, advertising, marketing and sale of Licensed Products.

102.    By Section 7.3, Food52 also agreed that "[a]ny trademark, other than Licensee's house mark or brand, that is adopted by Licensee in marketing Licensed Products in addition to a Licensed Trademark that becomes associated exclusively with any or all Licensed Products as a result of such marketing, shall revert to Form upon termination of this Agreement for any reason." (DLA Section 7.3).

103.    To remove any doubt, Food52 specifically acknowledged and agreed in DLA Section 4.5, that its only source of rights was the DLA, and

> "Licensee acknowledges and agrees that (i) this Agreement supersedes and replaces the Prior Agreements and the Prior Agreements are of no further force or effect; (ii) other than the license to the Licensed Designs granted to Licensee pursuant to this Agreement, Licensee holds no other rights with respect to designs or other intellectual property of the Licensed Designers."

104.    Despite (a) having contractually committed to cease making, having made, using, offering to sell or selling Licensed Products and (b) lacking any rights to utilize the trademarks, and (c) acknowledging that it holds no other rights with respect to designs or other intellectual property of the Licensed Designers, Food52 continues brazenly to offer products for which it has absolutely no rights to the design, trademarks, or any other intellectual property.

105.    For example, Food52's web site featuring the Quistgaard collection displays the following:



https://www.dansk.com/collections/cookware (retrieved Oct. 23, 2024)

106.    In addition to the continued sales of specifically identified "Licensed Product," Food52 is

continuing to use Licensed Trademark (e.g., the Jens Quistgaard name and history), as

well as continuing to use the "Kobenstyle" trademark. Examples of Food52's use of the

Licensed Trademark, and trademark and the trademark adopted for use in marketing the

products:





107.    As part of Dansk's "revival" of the Quistgaard archives, Food52 has newly introduced

"License Products" specifically identified in DLA "Appendix A.1a – In Production":



108.    Despite having terminated the DLA, Food52 continues offering these products for sale:



109.  As evidenced by the specific product SKUs, these items are included in the Appendix A.1a.

> **Købenstyle Wrapped Handle Water Pitcher, Arugula**
> SKU: B93217
> ☆ ☆ ☆ ☆ ☆   Write a review
> $95

110.  In addition, the specific products continue to be marketed with both the Licensed Trademarks (e.g., the designer's name and biographical data), and with the "Kobenstyle" trademark adopted in marketing the Licensed Product.

**Product Information**

Introducing our first revival from the Dansk archive. Designed by Jens Quistgaard in 1956, this iconic pitcher was last produced in 1967. The current design is faithful to the storied original, featuring a slightly larger body. From the elegant silhouette and signature black rim to the handwoven, rattan-inspired wrapped handle, this enameled carbon steel collectible combines form and function, whether it's serving drinks, bearing flowers, or exuding midcentury charm wherever you choose to display it. No wonder it's featured in an upcoming show on Scandinavian design in America at the Los Angeles County Museum of Art!

**N.    Food52's Interference and Breach of Agreements' Confidentiality and Publicity Provisions.**

111.    Doubling down on its false claims against Form, and its purported termination of the agreements, within hours of the June 10th purported termination, Food52's founder, Ms. Hesser, began contacting the designers with whom Form had agreements.

112.    Food52's Executive Chair has also contacted the designers Form brought into the Dansk project. Those communications not only falsely defame Form, and incorrectly describe the dispute, but (as set forth in Form's notices of breach) also violate multiple provisions in the agreements by (a) tortiously interfering with Form's relationships with those designers, and (b) wrongfully soliciting their direct relationship.

113.    In addition, Ms. Hesser communicated the following to several of Form's business associates including Form clients / brands whom it introduced to Dansk as sources of iconic designs it wished to sell alongside the licensed designs from Form, as evidenced below:

I'm the founder of Food52 -- as you may know, we purchased Dansk in 2021 because we wanted to revive a brand that was long a pillar of American home design. We have a vision for how to preserve its special heritage, re-establish it as a brand known for celebrating the work of exceptional designers, and set it up for success in the decades to come. In 2022, the company partnered with Form on the creative direction and expansion of our designer partnerships. You may have engaged with Form on our behalf.

Today, I wanted to reach out to you personally with an important update about the Form partnership.

Earlier this year, Food52's Board of Directors, in consultation with its outside counsel, uncovered some serious and concerning issues with Food52's agreements with Form. We raised these concerns multiple times over several months with Form and, unfortunately, could not reach a resolution. We therefore have been given no choice but to terminate our agreements with Form.

We see this decision--and I hope that you will, too--as a reflection of our deep commitment to the Dansk brand and to your designs. We also believe it is best if we engage with the design community directly. I am sure you will have questions and I will gladly connect with you whenever it is convenient for you.

All my best,

Amanda

114. The communication, and others like it, is a clear violation of the Agreements' confidentiality provisions.

115. Further, Food52's solicitation that "we believe it is best if we engage with the design community directly" was a direct solicitation to the designers that they terminate their own relationships with Form and work directly with Food52. These actions were not only in violation of the DLA, they were entirely without a legitimate business purpose and were intended to harm Form's reputation with its designers, clients and the design community

## IV.    CAUSES OF ACTION

### A.    FIRST CAUSE OF ACTION
### (BREACH OF THE SPA)

116. Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

117.   The parties duly entered into and executed the SPA on or about July 17, 2023.

118.   Form has performed all of its material obligations under the SPA, or has been excused from performance by Food52's material breach and repudiation of the SPA.

119.   Food52 has committed material breaches of the SPA, including but not limited to:

a.   Failing to pay the quarterly support payments of $100,000 owed pursuant to Section 5.1 of the SPA on or before April 17, 2024 and July 17, 2024 and October 17, 2024;

b.   Failing to provide the statements required pursuant to Section 5.2 of the SPA within 45 days from the end of a quarter.  Food52 has failed to provide the Dansk Gross Profits Reports, which were due on May 15, 2024 and August 15, 2024;

c.   Failing to make the required Participation Rights payments owed pursuant to Section 5.2 of the SPA and SPA Exhibit 5. The 2023 Q4 profit participation fee of $93,959 is in default and no payment has been made for Q1 and Q2 of 2024;

d.   Failing to honor Form's June 17, 2024 demand to inspect Dansk's books and records, as required by Section 5.4;

e.   Failing to provide Form with any executed confidential information disclosure agreement(s) from any party to which it has disclosed confidential information, as required by Section 2.2;

f.   The identity of Form's designers was confidential information (SPA Section 1.2) and Food52's attempt to induce them to work directly with Food52 violates the Agreements.

120.   The above breaches constitute material breaches of the SPA.

121.   On June 17, 2024, Form provided Food52 Notice of Breach for each of these breaches.

122.    Food52 failed to cure the breaches.

123.    Form has been damaged by the breaches, including:

a.      SPA Section 5.1 entitles Form to a $100,000 quarterly fee commencing from the July 17, 2023 Effective Date. The SPA has a 7-year Initial Term, ending July 17, 2030. (SPA 11.1(a)). Food52 defaulted in paying all payments from April 2024, and by this material breach, and its repudiation of the SPA by termination, Plaintiff is entitled to payment of the remaining 25 Support Services Fees support payments owed until July 2030, in an amount of at least $2.5 million.

b.      SPA Section 5.2 entitles Form to a Participation Right based on Dansk Gross Profits, which, in turn, is based on the sales of the Dansk Collection products. (See SPA 1.8). The "Dansk Collection" is defined in the fifth recital as the collection of existing and newly-created Dansk-branded products. Upon information and belief, Dansk's own projections by current management would result in Food52's Participation Right payments over the remainder of the SPA's term to exceed $10 million.

c.      Food52's breach of SPA's Confidentiality provision has caused injury to Plaintiff in an amount presently unknown and to be established.

**B.    SECOND CAUSE OF ACTION
       (BREACH OF THE DLA)**

124.    Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

125.    The parties duly entered into and executed the DLA on August 31, 2023, with an effective date of July 1, 2023.

126.  Form has performed all of its material obligations under the DLA, or has been excused from performance by Food52's material breach and repudiation of the DLA.

127.  Food52 has failed to perform its obligations and materially breached the DLA, and has repudiated its obligations under the DLA.  These material breaches include Food52's:

a.  Repudiating the DLA by its June 10, 2024 purported termination without cause and without complying with the 60-day notice required by DLA Section 11.2(a).

b.  Failing to pay royalties required by DLA Section 8.1.

c.  Failing to provide Form with the royalty reports required under DLA Section 8.2 for 2024 Q1, Q2 and Q3, which were due on April 15, 2024, July 15, 2024 and October 15, 2024.

d.  Violating DLA Section 10.1, by directly or indirectly challenging Form's intellectual property rights in and to Licensed Designs and Licensed Trademarks in respect of (a) Jens Harald Quistgaard are subject to an agreement between Qubra and Form whereby Form has the exclusive right to manage and license Quistgaard intellectual property, (b) Steen Ostergaard are subject to an agreement between Steen Ostergaard and Form whereby Form has the exclusive right to manage and license Steen Ostergaard intellectual property, and (c) Robert Wengler's designs are owned by Form.

e.  Violating DLA Section 10.5, which required Food52 to provide a copy of its "commercial general liability insurance policy" naming Form as an additional insured. On June 17, 2024 Form requested such evidence from Food52, but Food52 has refused to comply with this obligation.

f.    Violating <u>DLA Section 11.1 (b)</u>, which required Food52 to "(i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) cease using Licensed Trademarks for any purpose." Food52 is therefore wrongfully using the trademarks Jens Harold Quistgaard upon termination of the DLA "for any reason."

g.    Violating <u>DLA Section 12.1</u>, which prohibits a party from "originating any publicity … written or oral … relating to this Agreement to any amendment thereto or to performance hereunder or the existence of an arrangement between the parties without the prior written approval of the other party." The numerous emails sent on or about June 10, 2024 by Food52's Executive Chairman, attorneys, and agents to the clients and business associates of Form, concerning the purported termination of the DLA, violate Section 12.1 of the DLA.  Form has not given approval for the dissemination of these false, defamatory, and tortious emails and communications, which are causing damage to its business and contractual relationships.

h.    Violating <u>DLA Section 12.5(e)</u>, which bars Food52 from seeking relationships with designers for the duration of the seven-year term and a further five years.  In violation of this obligation, Food52's Ms. Hesser contacted Form's designers and spoke of Dansk's deep commitment to their work, and its desire to "engage with the design community directly."  Ms. Hesser then invited them to connect with her directly.

128.    The above breaches constitute material breaches of the DLA.

129.    On June 17, 2024, Form provided Food52 Notice of Breach for each of these breaches.

130.    Food52 failed to cure the breaches.

131.    Form has been damaged by the breaches, including, but not limited to, the following

damages:

    a.    DLA Section 8.4 entitles Form to a termination payment of $5,000 for each of the

"Licensed Designs" specified in Appendices A.1, A.2 and A.3 of the DLA. Upon

information and belief, Food52 owes Form payment of approximately $3 million

for products not launched.

    b.    By the DLA Amendment of November 22, 2023, an additional 112 designs were

added to the DLA. Food52 has not paid the $112,000 advance due Form.

    c.    DLA Section 6.2 entitles Form to an annual payment of $40,000 for Branding and

Support Services. The DLA's Initial Term is 7 years. Consequently, Food52's

material breach has caused damages in the amount of the $280,000 payment owed

pursuant to DLA Section 6.2.

    d.    DLA Section 11.1(b) obligates Food52 "(i) cease and no longer make, have made,

use, offer to sell or sell the DLA's Licensed Products for designers Jens Harold

Quistgaard, Steen Ostergaard, and Robert Wengler upon the termination of the

DLA "*for any reason*." Food52's breach is causing damages to Form in an

amount to be determined.

132.    The harm to Form from Food52's breach is irreparable, and Form is entitled to a

permanent injunction to enforce DLA Section 11.1(b).

133.    Form lacks an adequate remedy for Food52's failure to comply with this contractual

obligation, and therefore requires a judgment granting it the relief of specific

performance.

## C. THIRD CAUSE OF ACTION
## (BREACH OF FLA)

134. Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

135. The parties duly entered into and executed the FLA on January 11, 2023.

136. Form has performed all of its material obligations under the FLA, or has been excused from performance by Food52's material breach and repudiation of the FLA.

137. On June 17, 2024, Form provided Food52 with Notice of Breach, pursuant to Sections 11.2 and 12.4 of the Confidential Form Licensing Agreement of January 11, 2023 (corrected via Agreement of August 31, 2023).

138. Food52 has failed to perform its obligations and materially breached the FLA, and has repudiated its obligations under the FLA.  These material breaches include Food52's:

139. Repudiating its obligations under the FLA by its attempt to immediately and unilaterally terminate the FLA without cause;

    a.    Failing to pay quarterly royalty payments under <u>FLA Section 8.</u>1 for Licensed Products produced from designers Curry, Suppanen and Mergentime;

    b.    Failing to make the required termination payments owed pursuant to <u>FLA Section 8.4</u> for designs not launched by the projected launch dates specified in Appendices A.1, A.2 and A.3.

    c.    Failing to comply with <u>FLA Section 11.2 (d)</u> to promptly provide Form, upon termination for the FLA, an accounting on the inventory of Licensed Product Food52 has on hand;

d.    Failing to comply with <u>FLA Section 10.5</u>'s obligation to provide Form with a copy of the "commercial general liability insurance policy" naming Form as an additional insured.

e.    Failing to provide Form with the royalty report required under <u>FLA Section 8.2</u> for Q1 2024, which was due on April 15, 2024, thus the amounts due are unknown to Form at this time.

f.    Violating <u>FLA Section 12.1</u>'s prohibition on "originating any publicity … written or oral … relating to this Agreement to any amendment thereto or to performance hereunder or the existence of an arrangement between the parties without the prior written approval of the other party."  Food52's Executive Chair, attorneys, and agents to the clients and business associates of Form, have communicated with other entities concerning the purported termination of the FLA, without approval.

g.    Violating <u>FLA Section 12.5(e)</u> which provides that "During the period of this Agreement and for a period of five years thereafter, Licensee will take no action, make any commitment or enter into any arrangement or agreement involving any design by any Licensed Designer other than through this Agreement, an amendment to the Agreement or a new agreement with Form."

h.    Violating <u>FLA Section 2</u> by disclosing confidential information to third parties.

i.    Violating <u>FLA Section 8.2</u> by failing to provide Form with the royalty reports required.

140.    The above breaches constitute material breaches of the FLA.

141.    On June 17, 2024, Form provided Food52 Notice of Breach for each of these breaches.

142.    Food52 failed to cure the breaches.

143. Form has been damaged by Food52's breaches of the FLA, including, but not limited to, the following damages:

   a. FLA Section 8.1 entitles Form to quarterly royalty payments of 7.5% of Net Sales of the Licensed Products identified in FLA Appendices A.1, A.2 and A.3 for produced from designers Curry, Suppanen and Mergentime in an amount to be established.

   b. FLA Section 8.4 entitles Form to payment of $5,000 for each of the "Licensed Designs" specified in Appendices A.1, A.2 and A.3 of the FLA. The FLA (as amended on 11/22/23) includes 60 designs. Upon information and belief, Food launched six designs before breaching the agreements, meaning more than fifty-four were not launched. Upon information and belief, Food52 owes Form payment of at least $270,000.

   c. FLA Section 6.2 entitles Form to an annual payment of $40,000 for Branding and Support Services. Pursuant to FLA Section 11.1(a), the Initial Term is a period of five years, which totals $200,000.

   d. FLA Section 11.1(b) obligates Food52 to "(i) cease and no longer make, have made, use, offer to sell or sell the FLA's Licensed Products (for designers Curry, Suppanen and Mergentime) upon the termination of the FLA "for any reason.," Food52's breach is causing damages to Form in an amount to be determined.

144. Form's harm from Food52's breach is irreparable, and Form is entitled to a permanent injunction to enforce FLA Section 11.1(b).

145.    Form lacks an adequate remedy for Food52's failure to comply with this contractual obligation, and therefore requires a judgment granting it the relief of specific performance.

**D.    FOURTH CAUSE OF ACTION**
       **(VIOLATION OF LANHAM ACT TRADEMARK 15 U.S.C. § 1114 *et seq.*)**

146.    Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

147.    The Licensed Trademarks are defined in DLA Section 1.2 as:

> "Licensed Trademarks" are set forth in Appendix B attached hereto and shall include the name of the designer in question, their likenesses, signatures, logos and initials for use in connection with the promotion, advertising, marketing and sale of Licensed Products

148.    Appendix B attached to the DLA, identifies the designers, including Jens Quistgaard.

149.    Qubra is the owner of one of these defined Licensed Trademarks, that includes Quistgaard's name, likeness, signature, logos and initials.

150.    DLA Section 11.1(b) provides that upon termination of the DLA for any reason, Form52 will "cease using Licensed Trademarks for any purpose."

151.    With the DLA having been terminated by Food52's breach, or even by Food52's own voluntary termination, Food52 is prohibited from using the defined Licensed Trademarks.

152.    Food52 continues using the trademarks Jens Harold Quistgaard and Bill Curry.

153.    In addition to the defined Licensed Trademarks, Food52 has adopted other trademarks used in marketing the Licensed Product, which have become associated exclusively with the Licensed Products as a result of Food52's marketing.

154.    These marks include, but are not limited to, the "Kobenstyle" trademark, that is associated exclusively with any or all of the DLA's Licensed Products as a result of Dansk's marketing.

155.    The "Kobenstyle" trademark was registered by Dansk with the U.S. Patent and Trademark Office, with a registration date of April 16, 2013, and registration number 4320909.

156.    Form is a statutory registrant pursuant to 15 U.S.C. § 1127, as it is the assignee and/or successor to Dansk's registered "Kobenstyle" trademark at issue. The assigning document was effected by the DLA, which constitutes an "instrument[ ] in writing duly executed," 15 U.S.C. § 1060(a)(3), and the assignment transferred Dansk's ownership interest in the marks at issue.

157.    Specifically, DLA Section 7.3 provides that "[a]ny trademark, other than Licensee's house mark or brand, that is adopted by Licensee [Dansk] in marketing Licensed Products in addition to a Licensed Trademark that becomes associated exclusively with any or all Licensed Products as a result of such marketing, shall revert to Form upon termination of this Agreement for any reason."

158.    The DLA has terminated, whether by DLA's material breach and repudiation, or under Food52's own purported termination in June 10, 2024, and the right to the "Kobenstyle" trademark has reverted to Form upon that termination.

159.    Despite the DLA having terminated, and Food52's right to utilize the trademark having reverted to Form, and Food52 having no rights to the trademarks or the Licensed Trademarks, Food52 continues to use Licensed Trademarks in connection with the advertising and promotion of its products.

160.    On June 17, 2024, Form demanded that Food52 cease and desist from using all Licensed Trademarks and trademarks.

161.    Form52 has violated Section 32 of the Lanham Act, 15 U.S.C. §§ 1114, 1116-1118, and continues to use the "Kobenstyle" trademark in violation of Form's rights.

162.    Food52's use of the "Kobenstyle" trademark is willful and intentional and treble damages and statutory damages are appropriate under 15 U.S.C. § 1117(b).

163.    Pursuant to 15 U.S.C. § 1117(a), Form also is entitled to recover (1) defendant's profits, (2) any damages sustained by Form, and (3) the costs of the action.

164.    Food52's conduct is sufficiently wanton that the Form is also entitled to its reasonable attorney fees.  15 U.S.C. § 1117(a).

E.    **FIFTH CAUSE OF ACTION**
    **(VIOLATION OF LANHAM ACT DESIGNATION OF ORIGIN/TRADEMARK DILUTION, 15 U.S.C. § 1125 *et seq.*)**

165.    Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

166.    Food52's conduct with respect to the Quistgaard marks also violates Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and (c).

167.    In DLA Section 11.1(b), Food52 acknowledged that "(b) *Upon termination of the Agreement for any reason*, and subject to Licensee's right to sell inventory pursuant to Part 11.2(d) hereof, Licensee agrees that thereafter it will: (i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) *cease using Licensed Trademarks for any purpose*." (emphasis added).

168.    Food52 therefore no longer holds any rights to utilize the defined Licensed Trademarks, which includes the Jens Quistgaard name, initials, signature, biographical information and likeness.

169.  Food52 continues to use Jens Quistgaard's name, initials, signature, biographical information and likeness in marketing its products.

170.  Food52, in connection with any goods or services, or any container for goods, is using in commerce Jens Quistgaard's name, initials, signature, biographical information and likeness, or any combination thereof, and as a false designation of origin, false or misleading description of fact, or false or misleading representation of fact.

171.  Food52's use is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, undermining and damaging the valuable good will associated with the Quistgaard name, initials, signature, biographical information, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.  Specifically, Dansk no longer has the right to manufacture Quistgaard designs, and the designs offered by Dansk are not authorized by Quistgaard and/or Qubra.

172.  Food52's use in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, in violation of 15 U.S.C. § 1125.

173.  Form itself also is being damaged by Food52's violation of Lanham Act Section 43, because Form holds the exclusive rights to license these rights on behalf of Qubra.  The value of Form's exclusive rights is being injured by Food52's continued misrepresentation of the source of origin, false or misleading description of fact, or false or misleading representation of fact, including misrepresentation of the nature, characteristics, qualities, or geographic origin of Food52's goods, services, or

commercial activities, and unauthorized use of the Quistgaard distinctive and famous name, biography, initials.

174.    Form is entitled to royalites from use of the Quistgaard name and trademark.  Further, the Form/Qubra Collaboration Agreement explicitly provides Form the legal right to enforce unauthorized use of a Quistgaard Trademark.

175.    Form has been injured by Food52's continued unauthorized marketing of the Quistgaard products, in an amount to be established.

176.    Form is entitled to an injunction against Food52's continued misuse of the Jens Quistgaard's name, initials, signature, biographical information and likeness.

## F.    SIXTH CAUSE OF ACTION
   (DECLARATORY JUDGEMENT)

177.    Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

178.    Certain intellectual property rights, other than trademark rights, held by Jens Quistgaard were transferred to Dansk in the 1992 agreement and the 2012 agreement.

179.    The 2012 agreement had a 10-year term, unless Dansk provided timely notice to extend the term.

180.    The 1992 agreement and the 2012 agreement were defined in the DLA as the "Prior Agreements."

181.    Dansk failed to timely invoke its right to extend the 2012 agreement.

182.    In 2023, the parties agreed that the DLA would replace and supersede the Prior Agreements.

> Licensee acknowledges and agrees that (i) this Agreement supersedes and replaces the Prior Agreements and the Prior Agreements are of no further force or effect; (ii) other than the license to the Licensed Designs granted to Licensee

pursuant to this Agreement, Licensee holds no other rights with respect to designs or other intellectual property of the Licensed Designers.

183. Quistgaard and Qubra continued to hold all trademark rights with respect to works by Quistgaard, a "Licensed Designer."

184. Pursuant to the DLA, Food52 renounced any claim to "designs or other intellectual property of Licensed Designers," i.e., Quistgaard.

185. Subsequent to the DLA, Food52's only rights to the Quistgaard products were held through the DLA License.

186. This transfer comports with Copyright Act Section 201(d) "Transfer of Ownership," which provides:

> (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance...

17 U.S.C. § 201(d).

187. The DLA constitutes "an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent" within the meaning of Copyright Act Section 204(a).

17 U.S.C. § 204(a).

188. Plaintiff is entitled to a judicial declaration that Food52 holds no trademarks, copyrights, or other intellectual property with regard to any of the products identified in DLA Appendix A.

189. Plaintiff is entitled to a permanent injunction prohibiting Food52 from making, having made, offering, or selling any of the products identified in DLA Appendix A.

**G.    SEVENTH CAUSE OF ACTION**
**(ACCOUNTING)**

190.    Plaintiff repeats and realleges the contents of the Complaint's common allegations as if fully alleged herein.

191.    Form is entitled to an accounting of the inventory of Licensed Product which Food52 and its Affiliates and sublicensees have on hand as of the date of such termination. See DLA § 11.2(d) and FLA § 11.2(d).

192.    Form lacks an adequate remedy for Food52's failure to comply with this contractual obligation, and therefore requires specific performance of interim relief or a judgment granting it the relief of specific performance.

**V.    RELIEF REQUESTED**

193.    Plaintiff requests entry of a judgment against Food52 entailing:

a.    Monetary relief for the breach of contract, damages sustained by Form, in the amount to be proven at trial, but no less than the following:

SPA Damages

| | |
|---|---:|
| Support Services Fee (§5.1) | $2,500,000 |
| Profit Participation (§8.2) | to be determined, but believed to exceed $1,575,000 |

DLA Damages

| | |
|---|---:|
| Advance (§8.1) | $112,000 |
| Termination Fees (§8.4) | $3,000,000 |
| Creative Svc Fee (§6.2) | $280,000 |
| Royalties (§8.1) | to be determined, but believed to exceed $1,680,000 |

FLA Damages

| | |
|---|---:|
| Termination Fees (§8.4) | $280,000 |
| Creative Svc Fee (§6.2) | $160,000 |
| Royalties (§8.1) | to be determined, but believed to exceed $660,000 |

b.    A judgment and order that Food52 has willfully infringed Form's "Kobenstyle" trademark in violation of 15 U.S.C. §1114,

c.    An award of statutory damages pursuant to 15 U.S.C. § 1117(c);

d.    An award of three times the amount of compensatory damages and increased profits pursuant to 15 U.S.C. § 1117;

e.    A judgment and order that Food52 has used false designations of origin in its advertising in violation of 15 U.S.C § 1125(a) and (c) for products utilizing the Quistgaard name, likeness, initial, or biographical material;

f.    An order granting an award of damages suffered by Form according to proof at the time of trial;

g.    An order that Food52 account to Form for any and all profits earned as a result of Food52's acts in violation of Form's rights;

h.    An order granting an award of punitive damages for the willful and wanton nature of Food52's aforesaid acts;

i.    An order granting pre-judgment interest on any recovery by Form;

j.    An order granting an award of Form's costs, expenses, and reasonable attorneys' fees;

k.    A judicial declaration that Food52 holds no trademarks, copyrights, or other intellectual property with regard to any of the products identified in DLA Appendix A;

l.    A permanent injunction that Food52 stop using the Licensed Trademarks, Licensed Products and Licensed Designers' works and "Kobenstyle" trademark; and

m.      An order for other relief that the Court deems appropriate.

## VI.    JURY DEMAND

194.    Pursuant to Federal Rule of Civil Procedure 38(b), Form demands a jury trial on all of the

above claims.

Dated:  November 4, 2024

HINCKLEY & HEISENBERG LLP


By: /s/ Christoph Heisenberg
        George R. Hinckley, Jr.
        Christoph Heisenberg

        445 Hamilton Ave., Suite 1102
        White Plains, NY 10601
        (917) 312-7239
        george@hinckley.org
        cheisenberg@hinckley.org