UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FORM PORTFOLIOS LLC,

*Plaintiff*,

– against –

FOOD52, INC.,

*Defendant.*

**MEMORANDUM & ORDER**
24-cv-07690 (NCM) (CLP)

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Form Portfolios LLC sues defendant Food52, Inc. related to an intellectual property dispute over designs for cookware and homegoods. Defendant now moves to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim and Rule 12(b)(1) for lack of subject matter jurisdiction. For the reasons discussed below, defendant's motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

When individuals and companies create unique designs for consumer products, those designs can become valuable intellectual property. Plaintiff is a company founded in 2016 that owns and manages these types of designs. Compl. ¶ 1. The company engages in partnerships with other companies that are interested in licensing the designs that plaintiff owns or manages and selling products based on these designs. Compl. ¶ 1. Defendant is a company that makes and sells cookware and other homegoods under the brand Dansk. Compl. ¶¶ 2, 13. Plaintiff and defendant used to be collaborators, but now are involved in a dispute arising out of their former collaboration.

I.      Jens Quistgaard and the Dansk Brand

In 2021, defendant acquired Dansk, an iconic Scandinavian kitchenware brand founded in the 1950s. Compl. ¶ 2. Dansk is known for products designed by Jens Quistgaard, a Danish designer. Compl. ¶ 17. Quistgaard was the chief designer for Dansk from the 1950s to the 1980s. Compl. ¶ 18. After Quistgaard was no longer Chief Designer for Dansk, Quistgaard continued to develop designs for kitchenware on his own. Compl. ¶ 19. In 1992—long before defendant acquired Dansk—Dansk and Quistgaard entered into a contractual arrangement ("the 1992 Design Agreement") for Dansk to have the opportunity to purchase designs that Quistgaard continued to invent. Compl. ¶ 19. Under the agreement, Quistgaard would continue to submit designs to Dansk, which had the right to accept or reject the designs. Compl. ¶ 19. Quistgaard retained all rights for designs not accepted by Dansk. Compl. ¶ 19. The 1992 Design Agreement provided Dansk with a limited license to utilize Quistgaard's distinctive and famous name, signature, biographical data, photograph and/or likeness on the accepted designs. Compl. ¶ 20.

Quistgaard died in 2008, leaving intellectual property he personally owned to his heirs ("the Quistgaard Family"). Compl. ¶ 21. The Quistgaard Family set up a company called Qubra ApS ("Qubra") to own and manage the family designs. Compl. ¶ 21. The complaint refers to these family-owned designs as the "Quistgaard archives." Compl. ¶ 41.

In 2012—still years before defendant entered the picture—Dansk and Qubra entered into a new agreement ("the 2012 Design Agreement"). Compl. ¶ 21. The 2012 Design Agreement provided Dansk a right of first refusal to certain archival designs owned by Qubra that had not been marketed by Dansk under the 1992 Design Agreement. Compl. ¶ 22. The 2012 agreement again provided Dansk a limited license to utilize Quistgaard's name, initials, signature, biographical information, and likeness for

promotional materials for the additional accepted designs. Compl. ¶ 23. The 2012 Design Agreement had an initial term of 10 years and expired in 2022. Compl. ¶ 24.

II.    Plaintiff's and Defendant's Business Collaboration

Defendant acquired Dansk in 2021. Compl. ¶ 27. In January 2023, plaintiff and defendant entered into a contract known as the Form License Agreement ("FLA"), under which defendant would pay plaintiff specified amounts, and in exchange, defendant would be permitted to make and sell products based on certain designs owned or managed by plaintiff of three noted designers: Ilkka Suppanen, Bill Curry, and Marguerita Mergentime. Compl. ¶¶ 34–37.

In 2023, defendant also sought to gain access to certain designs by Quistgaard that were owned by the Quistgaard Family. Compl. ¶¶ 41–43. Defendant asked plaintiff to act as an intermediary between defendant and the Quistgaard Family because of plaintiff's expertise working with the heirs of designers. Compl. ¶ 44. Plaintiff spoke with the Quistgaard Family, who agreed to permit plaintiff to negotiate the Quistgaard Family's rights with Dansk. Compl. ¶ 45. In May 2023, plaintiff and Qubra entered into a collaboration agreement (the "Collaboration Agreement"). Compl. ¶ 45. The Collaboration Agreement granted plaintiff the exclusive right to negotiate with defendant, on Qubra's behalf, a new license agreement that would replace the 1992 and 2012 Design Agreements. Compl. ¶ 45. The Collaboration Agreement makes plaintiff Qubra's legal representative and grants plaintiff the right to take action to terminate unauthorized use of Quistgaard's trademarks. Compl. ¶ 45.

Once the Collaboration Agreement between Qubra and plaintiff was in place, plaintiff and defendant entered into an arrangement under which plaintiff would license Qubra's intellectual property to defendant and also provide creative consulting services.

Compl. ¶¶ 47, 61. This arrangement was memorialized via two written contracts. Compl. ¶¶ 53, 62.

The first written contract, finalized on July 17, 2023, was known as the Support and Participation Agreement ("SPA"). Compl. ¶¶ 48, 53, 55. The SPA stated that plaintiff and defendant "desire to commence an ongoing collaboration in order to create a collection of Scandinavian design products for the entire home under the Dansk brand using both existing [defendant] designs and [plaintiff] designs." Compl. ¶ 55.[1] The SPA stated that this "collection of existing and newly-created Dansk-branded products" would be known as "the Dansk Collection." Compl. ¶ 55. The SPA also specified that plaintiff would "license certain designs to [defendant], create certain designs for [defendant] and be the primary provider to [defendant] of valuable development and support services in creating and marketing of the Dansk Collection." Compl. ¶ 55. Under the SPA, plaintiff was entitled to receive a base fee of $100,000 per quarter plus 15% of the gross profits of the first $100m in sales of all Dansk Collection products. Compl. ¶¶ 56 – 57.

The SPA contemplated that plaintiff and defendant would enter into a separate license agreement to replace the 1992 and 2012 Design Agreements and provide defendant with rights to designs in the Quistgaard archives. Compl. ¶ 59. The SPA acknowledged that "[defendant] owns the heritage brand 'Dansk' and licenses certain designs used by Dansk pursuant to various intellectual property licenses, including but not limited to designs by Jens Quistgaard/Qubra . . . referred to collectively as the 'Existing License Agreements'." Compl. ¶ 60. The SPA then stated that the parties intended to negotiate a new license agreement by which "(i) certain of the Existing License Agreements pertaining to designs

---

[1]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

by Jens Quistgaard and/or Qubra that are exclusively managed by [plaintiff] shall be consolidated and updated (with respect to date, duration, price and other terms), and (ii) [plaintiff] will license numerous additional designs created by Jens Quistgaard and . . . other designers, and trademarks related to such designers, to [defendant]." Compl. ¶ 61.

The second agreement that plaintiff and defendant entered into, titled the Dansk License Agreement ("DLA"), consummated the intention that the parties had expressed in the SPA to enter into a separate license agreement. *See* Compl. ¶ 62. The DLA acknowledged that defendant "owns the heritage brand 'Dansk', selling . . . products using certain Quistgaard designs that were previously licensed pursuant to the Prior Agreements (as hereinafter defined)." Compl. ¶ 63. The DLA defines "Prior Agreements" as the 1992 Design Agreement and the 2012 Design Agreement. Compl. ¶ 64. The parties intended that the DLA would constitute a uniform and sole agreement with respect to individuals referred to as the "Licensed Designers." Compl. ¶ 65. Specifically, the DLA stated that "[defendant] acknowledges and agrees that (i) [the DLA] supersedes and replaces the Prior Agreements and the Prior Agreements are of no further force or effect; (ii) other than the license to the Licensed Designs granted to [defendant] pursuant [the DLA], [defendant] holds no other rights with respect to designs or other intellectual property of the Licensed Designers." Compl. ¶ 65. The agreement specified that Jens Quistgaard was one of the Licensed Designers. Compl. ¶ 66. The agreement also specified that "Licensed Designs" refers to "all designs . . . furnished by [plaintiff] to [defendant] hereunder relating to the design of the product or products identified in The Appendices" and "consists of Appendix A.1a (Quistgaard currently in production as of the Effective Date), Appendix A.1b (Quistgaard on order and in development Kobenstyle), Appendix A.1c (Quistgaard all

remaining table top designs), [and] Appendix A1.d (Quistgaard furniture)." Compl. ¶¶ 67–68.

The DLA also included provisions about what would occur upon its termination. The DLA states that "[u]pon termination of the Agreement for any reason, . . . [defendant] agree[s] that thereafter it will (i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) cease using Licensed Trademarks for any purpose." Compl. ¶ 71. The DLA also states that "[a]ny trademark, other than [defendant]'s house mark or brand, that is adopted by [defendant] in marketing Licensed Products in addition to a Licensed Trademark that becomes associated exclusively with any or all Licensed Products as a result of such marketing, shall revert to [plaintiff] upon termination of this Agreement for any reason." Compl. ¶ 72. The DLA Appendices specified the "Licensed Products" by SKUs and with photographs. Meanwhile, the DLA specified that "Licensed Trademarks" are "set forth in Appendix B attached hereto and shall include the name of the designer in question, their likenesses, signatures, logos and initials for use in connection with the promotion, advertising, marketing and sale of Licensed Products." Compl. ¶ 101.

III.    Defendant's Alleged Breach and Termination

In December 2023, defendant underwent a change in leadership and began pivoting away from aspects of its planned expansion of the Dansk brand. Compl. ¶ 3. Defendant sought to renegotiate the fees that it was paying to plaintiff, but plaintiff did not consent to lower the agreed-upon fees. Compl. ¶ 88. Around this same time, defendant unilaterally ceased making payments to plaintiff, including royalties and licensing payments that exceeded $610,000 as of the date of the complaint. Compl. ¶ 84. On June 10, 2024, defendant sent a letter to plaintiff purporting to terminate the DLA,

the SPA, and the FLA. Compl. ¶ 89. The letter asserted that defendant had been under "incorrect assumptions concerning the prior design agreements with the Quistgaard family and ownership of the intellectual property rights." Compl. ¶ 90. The letter also stated—falsely, according to plaintiff—that the FLA, SPA, and DLA were not reviewed by defendant's lawyers and not approved by its Board. Compl. ¶ 91.

According to plaintiff, as of the date of the complaint, defendant continues to sell products covered by the DLA and continues to use various trademarks that plaintiff alleges are now owned by plaintiff, including the Jens Quistgaard name and the Kobenstyle registered trademark. Compl. ¶¶ 104–10.

IV.    The Instant Suit

On November 4, 2024, plaintiff brought the instant suit against defendant. Compl. 43.[2] The complaint raised seven claims: (1–3) breach of contract of the SPA, DLA, and FLA; (4) registered trademark infringement under Section 32 of the Lanham Act; (5) false association, false advertising, and trademark dilution under Section 43 of the Lanham Act; (6) Declaratory Judgment Act; and (7) accounting. Compl. ¶¶ 116–92. The complaint asserts that the Court has federal question jurisdiction over the Lanham Act and Declaratory Judgment Act claims and supplemental jurisdiction over the contractual claims. Compl. ¶ 10.

In March 2025, defendant moved to dismiss the entire suit, arguing that the federal claims could not survive challenge under Rule 12(b)(6), and that without a valid federal claim in the case, the state law claims must be dismissed for lack of subject-matter

---

[2]    Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

jurisdiction under Rule 12(b)(1). *See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Mot."), ECF No. 21-1. Plaintiff filed an opposition. *See* Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Opp'n"), ECF No. 22. Defendant filed a reply. *See* Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss ("Reply"), ECF No. 23.

## LEGAL STANDARD

When deciding a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014). "The issue" on a motion to dismiss "is not whether a plaintiff will ultimately prevail" but instead whether a plaintiff is "entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, dismissal is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). At the same time, plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Conclusory allegations and legal conclusions masquerading as factual conclusions do not suffice to prevent a motion to dismiss. *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 366 (E.D.N.Y. 2005) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).

## DISCUSSION

Defendant argues that each of plaintiff's three federal law claims is deficient and must be dismissed. Mot. 5; Reply 5. The motion further argues that without a valid federal claim in the case, the remaining claims must be dismissed for lack of subject-matter jurisdiction. Mot. 5; Reply 5. The federal law claims raised in the complaint are Count IV (Section 32 of the Lanham Act), Count V (Section 43 of the Lanham Act), and Count VI

(Declaratory Judgement Act). The Court considers defendant's arguments for dismissing each count.

I.    <u>Plaintiff's Claim Under Section 32 of the Lanham Act (Count IV)</u>

Plaintiff's fourth claim alleges that defendant has violated Section 32 of the Lanham Act, 15 U.S.C. §§ 1114, 1116–1118. Compl. ¶ 161. Specifically, plaintiff alleges that the termination of the DLA transferred ownership of the Kobenstyle trademark from defendant to plaintiff and that defendant's continued use of the trademark following this transfer constitutes unlawful infringement of a registered trademark. Compl. ¶¶ 156–59.

Section 32 is a statute under federal trademark law that allows the owner of a federally registered trademark to initiate lawsuits against parties who use the owner's trademark without permission. The statute specifies that anyone who "without the consent of the registrant . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . or advertising of any goods [in a manner] likely to cause confusion [or] mistake . . . shall be liable in a civil action by the registrant." 15 U.S.C § 1114(1). Under Section 32, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 145–46 (2d Cir. 2007).

The registered trademark that plaintiff alleges defendant is using without its authorization is the Kobenstyle trademark. Compl. ¶¶ 106, 154–56. Kobenstyle refers to a specific line of cookware. Compl. ¶¶ 106, 154–56. The Kobenstyle trademark was registered with the U.S. Patent and Trademark Office by Dansk on April 16, 2013 and assigned registration number 4320909. Compl. ¶ 155. As of the date of the complaint,

defendant's website lists for sale many items bearing the Kobenstyle trademark, such as the "Kobenstyle Cornflower 1 Qt. Saucepan" for $72.00. Compl. ¶¶ 105–06.

Count IV is at bottom a dispute over which party currently owns the Kobenstyle trademark. Both parties agree that this trademark was initially owned by Dansk in 2013 and subsequently became owned by defendant when defendant purchased Dansk in 2021. Compl. ¶¶ 2, 27, 155; Mot. 6–7. Plaintiff argues, however, that the DLA included a provision—Section 7.3—that transferred ownership of the Kobenstyle trademark to plaintiff upon the DLA's termination. Compl. ¶¶ 156–58. Section 7.3 states that "any trademark, other than Licensee's house mark or brand, that is adopted by Licensee [Dansk] in marketing Licensed Products in addition to a Licensed Trademark that becomes associated exclusively with any or all Licensed Products as a result of such marketing, shall revert to Form upon termination of this Agreement for any reason." Compl. ¶ 157. The complaint alleges that the Kobenstyle trademark has become "associated exclusively with any or all of the DLA's Licensed Products as a result of Dansk's marketing." Compl. ¶ 154. And the complaint alleges that because the DLA has terminated, "the right to the 'Kobenstyle' trademark has reverted to Form upon that termination." Compl. ¶ 158. Implicit in this allegation is that the Kobenstyle trademark is encompassed by the DLA's reference to "any trademark" and that the Kobenstyle trademark is not "[defendant]'s house mark or brand." Compl. ¶ 157. The complaint further asserts that, now that plaintiff owns the Kobenstyle trademark, defendant's continued sale of Kobenstyle products constitutes infringement of a registered trademark now owned by plaintiff. Compl. ¶¶ 159–61.

Defendant argues that the Section 32 claim must be dismissed because plaintiff's complaint does not successfully allege that plaintiff owns the Kobenstyle trademark.

Mot. 10. To have standing to sue for registered trademark infringement under the Lanham Act, a plaintiff must demonstrate that it owns (i.e. is the "registrant" of) the registered mark in question. *See* 15 U.S.C. § 1114(a); *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013). Defendant offers several reasons why it believes ownership of the trademark has not transferred to plaintiff despite the termination of the DLA.

Looking to the text of the DLA, defendant notes that Section 7.3 refers to circumstances where trademarks will "revert" to plaintiff and argues that the parties' choice of this word necessarily excludes the Kobenstyle mark because plaintiff never owned the Kobenstyle mark to begin with. Mot. 11. The word "revert" means "to return to" or "to go back to." *See Revert,* Merriam-Webster, https://www.merriam-webster.com/dictionary/revert [https://perma.cc/85UH-3VUK]; *see also Revert,* Oxford English Dictionary, https://www.oed.com/dictionary/revert_v [https://perma.cc/GLH8-Q896] ("Of an estate: to return to the original owner, or to his or her heirs, after the expiry of a grant."). This word would seem most apt in relation to a piece of intellectual property that had previously been owned by the party to whom the intellectual property is reverting. That would make sense, for example, if Section 7.3 referred to intellectual property that plaintiff had owned prior to the DLA, that plaintiff was transferring to defendant upon the consummation of the DLA, and that would "go back to" plaintiff in the event of the termination of the DLA. Defendant points out that plaintiff never owned the Kobenstyle trademark prior to the initiation or termination of the DLA, so it would not have made sense for the parties to use the word "revert" if they meant to refer to trademarks like the Kobenstyle mark rather than just marks that had passed from plaintiff to defendant.

This argument may be meritorious at summary judgment or trial. However, at the motion to dismiss stage, the Court must accept plaintiff's allegations as true and "should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). Section 7.3 is not a model of clarity, but notably, it states that certain trademarks are exempt from "revert[ing]" to plaintiff— namely, "Licensee's house mark or brand." Compl. ¶ 157. Presumably, defendant's "house mark or brand"—likely encompassing the trademark "Food52" or "Dansk"—was not previously owned by plaintiff. Thus including the language "other than Licensee's house mark or brand" in the sentence "[a]ny trademark, other than Licensee's house mark or brand, that is adopted by Licensee in marketing . . . shall revert to [plaintiff] upon termination of [the DLA]" could be interpreted as the parties intending the word "revert" to apply to marks regardless of whether the mark had been previously owned by defendant. At this stage, the Court is not determining whether Section 7.3 actually transferred ownership of the Kobenstyle mark—the Court is merely determining whether the complaint's assertion that Section 7.3 transferred ownership of the mark is "plausible." *Twombly*, 550 U.S. at 570. Given the inclusion of the language "other than Licensee's house mark or brand," the Court does not find it outside the realm of plausibility that "revert" covers trademarks beyond those that plaintiff previously owned, like the Kobenstyle mark.

Defendant also raises a statutory argument that ownership of the Kobenstyle mark has not transferred to plaintiff. Defendant contends that even if Section 7.3 is appropriately understood as an attempt to transfer the Kobenstyle mark, Section 7.3 fails to actually transfer ownership because the provision is a prohibited "in gross" transfer of

trademark rights. Mot. 10. To understand this argument, it helps to begin with first principles.

A trademark is a sign—such as a word, name, or symbol—that a business uses to identify and distinguish its goods from goods manufactured or sold by others. 15 U.S.C. § 1127. "[E]very trademark's primary function is to identify the origin or ownership of the article to which it is affixed." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 145–46 (2023). In other words, "a mark tells the public who is responsible for a product." *Id.* at 146. For example, a well-known trademark owned by Nike Inc. makes clear to consumers that sneakers emblazoned with the silhouette of a swoosh are legitimate Nike sneakers, not sneakers made by a rival shoe company.

Every trademark has an inherent and necessary connection to consumers' mental perceptions of the product, service, or business that the trademark represents. This is commonly referred to as "good will." *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003) ("[T]rademark law accords merchants the exclusive right to the use of a name or symbol in their area [of] commerce . . . so that the merchants can establish goodwill for their goods based on past satisfactory performance, and the consuming public can rely on a mark as a guarantee that the goods or services so marked come from the merchant who has been found to be satisfactory in the past.") Because of this inherent connection between trademarks and consumer perceptions, a trademark is considered to have "no existence separate from the good will of the product or service it symbolizes." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 2:15 (5th ed. 2025). Accordingly, unlike patents and copyrights, trademarks may not be transferred as mere abstract intellectual property severed from the public perception of the underlying trademarked product, service, or business. *See* 15 U.S.C. § 1060 ("A registered mark . . .

shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."); *Fed. Treasury*, 726 at 75–76; 1 McCarthy § 2:15 ("[A] trademark cannot be assigned to another apart from the accompanying good will which it symbolizes."); *Berni v. Int'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988) ("[T]rademark rights do not exist in the abstract, to be bought and sold as a distinct asset."). Instead, for a trademark transfer to be valid, the transfer must include the underlying trademarked commercial undertaking in some meaningful respect. *Fed. Treasury Enter.*, 726 F.3d at 75–76. If a trademark is assigned "in gross"—that is, without its accompanying good will—then the assignment is considered invalid. *Fitzpatrick v. Sony-BMG Music Ent., Inc.*, No. 07-cv-02933, 2010 WL 3377500, at *2 (S.D.N.Y. Aug. 24, 2010).

In this case, defendant argues that Section 7.3 is at most a prohibited "in gross" transfer of trademark rights. Mot. 10. Defendant asserts that the DLA "does not transfer . . . any goodwill whatsoever" and "[p]laintiff [does not] allege that it has acquired . . . the goodwill associated with the Kobenstyle Mark or the business the Kobenstyle Mark represents." Mot 11. On this basis, defendant argues that the Kobenstyle mark has not changed hands, notwithstanding the language of Section 7.3.

Plaintiff concedes that no aspect of defendant's business has changed hands but points out that a trademark can be validly transferred even without transfer of the underlying business so long as the recipient continues or intends to continue producing similar goods. Opp'n 25; *see also Defiance Button Mach. Co.*, 759 F.2d at 1059 ("[A] trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark."). The fundamental requirement for a valid transfer

of trademark is continuity of the underlying product or business. *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994) ("[R]ather than looking for some formalistic passage of assets, the test is simply whether the transaction is such that the assignee can go on in real continuity with the past.") Accordingly, courts will recognize a transfer of a trademark to be valid where "(a) the goodwill of the concern has not wholly dissipated, (b) the . . . assignee retains the intent to produce or market within a reasonable time a product or service substantially the same in nature and quality as that with which the trademark has been associated, and (c) such resumption of operations occurs within a reasonable time under the circumstances." *Defiance Button*, 759 F.2d at 1060; *see* Opp'n 25.

The Court holds that under the *Defiance Button* standard, plaintiff's complaint fails to allege a valid transfer of trademark ownership because the complaint does not plead that plaintiff intends to produce or market Kobenstyle products within a reasonable timeframe. Plaintiff's opposition asserts, baldly, that "[t]he Complaint alleges this." Opp'n 25. But this assertion is not followed by a citation to the complaint, and the Court's own review of the complaint finds no allegation that plaintiff intends to market its own Kobenstyle goods or engage in a partnership with a different collaborator to do so. It is also not sufficient that plaintiff's opposition brief argues that plaintiff will take these steps. *See* Opp'n 25–26 ("[Plaintiff] intends to market, or license to other entities, the Kobenstyle marks. It is not in a position to license it to others at the moment because [defendant] has refused to cease manufacturing these items, meaning the value of [plaintiff]'s rights are impaired.") The inclusion of assertions in a legal brief is not the same as pleading factual allegations in a complaint. "[A]rguments and facts alleged in a brief in response to a motion to dismiss are not facts the Court can consider in evaluating the sufficiency of a

complaint." *Bristol v. Town of Camden*, 669 F. Supp. 3d 135 (N.D.N.Y. 2023); *see also Smith v. Daou*, No. 21-cv-12056, 2024 WL 911733, at *3 n.4 (D. Mass. Mar. 4, 2024) ("Assertions in an opposition to a motion to dismiss are not the equivalent of factual allegations, and the Court will not consider them as if pled in the . . . complaint.").

For the above reasons, the Court concludes that plaintiff has failed to state a valid Section 32 claim for infringement of the Kobenstyle trademark. The Court finds it unnecessary to reach the other arguments that defendant lodges in support of dismissing this claim.

II.    Plaintiff's Claim Under Section 43 of the Lanham Act (Count V)

Plaintiff's fifth cause of action alleges that defendant has violated Section 43(a) and Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(a) and (c). Compl. ¶ 166. Section 43(a) is a statute meant to prohibit certain types of unfair competition. It "creates two distinct bases of liability." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Section 43(a)(1)(A) covers "false association" while Section 43(a)(1)(B) covers "false advertising." *Id.* Meanwhile, Section 43(c) prohibits what is known as trademark dilution. 15 U.S.C. § 1125(c); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 118 (2d Cir. 2006).

Section 43(a)(1)(A) creates a federal cause of action to sue for infringement of an unregistered trademark, which is sometimes referred to as a claim for "false association." *Matal v. Tam*, 582 U.S. 218, 225–26 (2017); 4 McCarthy § 27:14. "The standards governing claims for unfair competition, under Section 43(a) . . . , and for [registered] trademark infringement, under Section 32, are substantially the same." *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021). However, when "suing under § 43(a) for infringement of an unregistered trademark, plaintiff must prove both validity and

infringement, unaided by any presumptions." 4 McCarthy § 27:14 (citing *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990 (2d Cir. 1987)).

Section 43(a)(1)(B) is different from Section 43(a)(1)(A). It creates a federal cause of action for false advertising, which is distinct from trademark infringement. 4 McCarthy § 27:14. The statute prohibits misrepresentations as to the "nature, characteristics, qualities, or geographic origin" of goods "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B); *ITC Ltd.*, 482 F.3d at 169. An infringement claim "cannot be re-packaged as a false advertising claim in order to avoid having to prove trademark validity." 4 McCarthy § 27:14.

Finally, Section 43(c) prohibits a specific type of conduct known as trademark dilution. This occurs when an entity uses a famous trademark that it does not own in such a way that the use dilutes the mark's quality by blurring or tarnishment. *United Air Lines, Inc. v. United Airways, Ltd.*, No. 09-cv-04743, 2013 WL 1290930, at *1 (E.D.N.Y. Mar. 4, 2013).

The conduct that plaintiff alleges violates Section 43 is defendant's use of Jens Quistgaard's name, initials, signature, biographical information, and likeness. Compl. ¶¶ 166, 168, 173. Plaintiff alleges that defendant agreed that upon termination of the DLA, defendant would: "(i) cease and no longer make, have made, use, offer to sell or sell Licensed Products; and (ii) cease using Licensed Trademarks for any purpose." Compl. ¶ 167. Plaintiff alleges that the DLA defines "Licensed Trademarks" to include "the Quistgaard name, initials, signature, biographical information and likeness." Compl. ¶¶ 101, 148, 168. And plaintiff alleges that defendant nevertheless continues to use Quistgaard's name, initials, signature, and so on in marketing its products. Compl. ¶ 169. Plaintiff asserts that it "holds the exclusive rights to license these rights on behalf of

Qubra." Compl. ¶ 173. Moreover, plaintiff alleges that "[t]he value of [plaintiff]'s exclusive rights is being injured by" defendant's "misrepresentation[s]" and "false or misleading description[s]" of goods that defendant sells, as well as by defendant's "unauthorized use of the Quistgaard . . . name, biography, [and] initials." Compl. ¶ 173. Plaintiff also alleges that it has been injured by defendants "unauthorized marketing of the Quistgaard products." Compl. ¶ 175.

The Court first examines whether plaintiff has plausibly alleged that defendant's conduct violates Section 43(a) and then evaluates the same with respect to Section 43(c).[3]

### A.   Section 43(a)

Defendant argues that plaintiff cannot maintain an action under Section 43(a) because plaintiff has failed to establish standing and failed to adequately plead either unregistered trademark infringement under Section 43(a)(1)(A) or false advertising under Section 43(a)(1)(B). Mot. 13–18. The Court considers each argument in turn.

### 1.   Standing

The bar for standing for a Section 43(a) claim is substantially lower than for a Section 32 claim. Section 43(a) grants standing to "any person who believes that he or she is likely to be damaged." 15 U.S.C. § 1125(a)(1). Although "[r]ead literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III," the Supreme Court has held that standing to sue under Section

---

[3]     The fifth cause of action in the Complaint is a single count for violation of 15 U.S.C. § 1125. Compl. 37. The count is premised on violations of 15 U.S.C. § 1125(a) and 1125(c). Compl. ¶ 166. Although this constitutes a single claim, the Court uses the phrase "false association claim" (and similar language) to refer to the cause of action insofar as it rests on an alleged violation of Section 1125(a)(1)(A), "false advertising claim" insofar as it rests on an alleged violation of Section 1125(a)(1)(B), and "trademark dilution claim" insofar as it rests on an alleged violation of Section 1125(c).

43(a) applies only to plaintiffs who meet a two part test: those (1) "whose interests fall within the zone of interests protected by the law invoked" and (2) "whose injuries are proximately caused by violations of the statute." *Lexmark*, 572 U.S. at 129, 132.

To start, plaintiff falls within the zone of interests protected by Section 43(a). "The scope of the zone of interests is not 'especially demanding,' and the plaintiff receives the 'benefit of any doubt.'" *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 707 (4th Cir. 2016) (quoting *Lexmark*, 572 U.S. at 130). With respect to claims for unregistered trademark infringement, a plaintiff need not be the unregistered trademark's owner to meet *Lexmark*'s "zone of interests" test. *See Ripple Analytics Inc. v. People Ctr., Inc.*, 153 F.4th 263, 271 (2d Cir. 2025). For example, "[c]ourts have consistently recognized that this broad language confers standing on trademark licensees." *Calvin Klein Jeanswear Co. v. Tunnel Trading,* No. 98-cv-05408, 2001 WL 1456577, at *5 (S.D.N.Y. Nov. 16, 2001). Plaintiff's complaint alleges that it is precisely such a licensee, having been authorized by the Collaboration Agreement between Qubra and plaintiff to itself re-license the Quistgaard marks and receive royalties from such re-licensing activity. *See, e.g.*, Compl. ¶ 127 (alleging the existence of "an agreement between Qubra and [plaintiff] whereby [plaintiff] has the exclusive right to manage and license Quistgaard intellectual property). The Court also finds that plaintiff clears the low bar of the zone-of-interests test with respect to its allegations regarding false advertising. For example, plaintiff alleges that its re-licensing rights are being harmed by defendant's marketing and promotional materials. *See, e.g.*, Compl. ¶¶ 159, 172, 175.

Second, plaintiff has plausibly alleged proximate cause. Proximate cause requires that the plaintiff allege "economic or reputational injury flowing directly from the deception wrought by the defendant's" conduct. *Lexmark*, 572 U.S. at 133. The central

issue is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* Plaintiff easily satisfies this requirement. This is not a case where causation is nebulous or complex. Rather, plaintiff is alleging that it holds the exclusive right to re-license certain rights on behalf of Qubra and the value of the right to re-license those rights is diminished insofar as defendant is engaging in commercial activity that requires those rights without permission and without paying.

Because plaintiff meets both elements of *Lexmark*'s two-prong standing test, the Court accordingly concludes that plaintiff has standing to raise a Section 43(a) claim.

### 2. *Unregistered Trademark Infringement (False Association)*

Defendant next argues that even if plaintiff had standing, the Court must dismiss the unregistered trademark infringement claim because defendant is using Jens Quistgaard's name and initials only in a descriptive and factual sense—to convey to consumers that defendant is selling goods that were, in fact, designed by Quistgaard. Mot. 15–16; Reply 13. Defendant argues that this use "constitutes fair use under the Lanham Act and is not actionable by [p]laintiff." Mot. 16; *see also* Reply 13.

The doctrine of classic fair use "is a defense to a charge of trademark infringement under which the [defendant] argues that it is not using a descriptive, geographically descriptive, or personal name designation in a trademark sense, but only to describe the defendant's goods or services, or their geographic origin, or to name the person involved in running the business." 1 McCarthy § 11:45. "[T]he mere fact that someone owns a mark that contains a particular word or phrase does not grant the holder the exclusive right to use that word or phrase commercially. . . . Where another person uses the words constituting that mark in a purely descriptive sense, this use may qualify as permissible fair use." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Fair use is a statutory

defense to registered or unregistered trademark infringement. *See* 15 U.S.C. § 1115(b)(4) (making it a defense to registered trademark infringement "[t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin"); *W. Publ'g Co. v. Rose Art Indus., Inc.*, 733 F. Supp. 698, 700–01 (S.D.N.Y. 1990), *aff'd on other grounds*, 910 F.2d 57 (2d Cir. 1990) (noting that the classic fair use defense set out in Section § 33(b)(4) of the Lanham Act also applies to claims of unregistered trademark infringement). As one treatise notes, when a trademark owner trademarks a word or term that is descriptive, "the trademark owner must live with the result that everyone else in the marketplace remains free to use the term in its original 'primary' or descriptive sense." 1 McCarthy § 11:45.

Defendant's assertion that its conduct constitutes fair use of the unregistered Quistgaard trademarks is not an appropriate basis on which to grant a motion to dismiss under Rule 12(b)(6). Classic fair use is an affirmative defense. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 114 (2004) (discussing "the statutory affirmative defense of fair use to a claim of trademark infringement"). For this reason, it is typically inappropriate to resolve the defense at the motion to dismiss stage. *Kelly-Brown*, 717 F.3d at 308 (2d Cir. 2013) ("Because fair use is an affirmative defense, it often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss."); *see also* 1 McCarthy § 11:49 ("Because classic fair use is an affirmative defense, it is normally not appropriate for consideration on a [12(b)(6) motion]. Classic fair use can [instead] be determined on a motion for summary judgment.").

Thus, defendant's motion to dismiss plaintiff's false association claim is denied.

### 3.    *False Advertising*

Defendant argues that plaintiff's false advertising claim must be dismissed because it is duplicative with the unregistered trademark infringement claim. The Court agrees.

Section 43(a)(1)(B) prohibits false advertising by creating a cause of action against anyone who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his . . . goods." 15 U.S.C. § 1125(a)(1)(B). Federal law does not "prohibit false statements generally" but rather "prohibits only false or misleading descriptions or false or misleading representations of fact made about one's . . . goods or services." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001). "A plaintiff may establish that a statement is false under two theories: either by demonstrating that challenged advertisement is 'literally false, *i.e.*, false on its face,' or that the statement, while literally true, constitutes an implied falsehood that is 'nevertheless likely to mislead or confuse consumers.'" *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 221 (E.D.N.Y. 2020) (first quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007); and then quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2010)).

Plaintiff's opposition to defendant's motion to dismiss argues that defendant has engaged in conduct that would constitute false advertising under the second type of theory: a true statement that constitutes "an implied falsehood that is nevertheless likely to mislead or confuse consumers." *Id.*; Opp'n 22–23. Specifically, plaintiff argues that defendant is "creating the false impression that it remains authorized to sell the defined Licensed Products when it is not." Opp'n 22 (citing Compl. ¶ 172). Defendant points out that there is a great deal of similarity between plaintiff's false association argument (that

defendant is presenting consumers with products featuring the Quistgaard trademarks without authorization) and plaintiff's false advertising argument (that defendant is misleading consumers by making them think that defendant is authorized to sell products featuring the Quistgaard trademarks when in fact defendant is not so authorized). Mot. 17–18. Defendant argues that "[h]arm created by a false suggestion of authorization is protected by the false association statute under Section 1125(a)(1)(A)" and not "by the false advertising statute under Section 1125(a)(1)(B)." Mot. 17–18. The Court agrees that plaintiff has failed to allege facts demonstrating that its false advertising claim is distinct from its false association claim.

The Court does not find plaintiff's rebuttal persuasive. Plaintiff cites a case where the Fourt Circuit Court of Appeals permitted a false association claim and a false advertising claim that overlapped with it to proceed in parallel. Opp'n 22–23 (citing *Belmora*, 819 F.3d at 713). However, the false statements involved in that case were unlike those alleged here. In *Belmora*, the defendant made extensive, detailed statements in its promotional materials implying that defendant's product was the same as plaintiff's. *See Belmora*, 819 F.3d at 703. For example, defendant circulated a promotional brochure to prospective distributors that stated that plaintiff's trademarked brand—which was sold only in Mexico—was "now made in the U.S." and that distributors should sign up to distribute the product because they "too can profit from this highly recognized topselling brand." *Id*. The *Belmora* Court found that defendant's "alleged false statements go beyond mere claims of false association; they parlay the passed-off . . . mark into misleading statements about the product's nature, characteristics, qualities, or geographic origin, all hallmarks of a false advertising claim." *Id*. at 712–13. By contrast, in this case, the idea that consumers will falsely believe that defendant is authorized to sell trademarked goods does

not sufficiently entail or imply a false statement that "go[es] beyond mere claims of false association." *Id.* at 712–13.

Thus, defendant's motion to dismiss plaintiff's false advertising claim is granted.

### B.   Trademark Dilution

Defendant's motion to dismiss argues that plaintiff's complaint does not allege the requisite elements for a trademark dilution claim. Mot. 18–19. Plaintiff's opposition makes no mention of trademark dilution and does not attempt to address or rebut defendant's arguments. The Court concludes that plaintiff's "failure to address this argument in opposition to the defendant's motion to dismiss amounts to a concession." *Cui v. Planet Green Holdings, Inc.*, No. 23-cv-05683, 2025 WL 2042431, at *5 (E.D.N.Y. July 21, 2025); *see also Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 318 n.10 (S.D.N.Y. 2021). Accordingly, the Court finds that plaintiff has abandoned its trademark dilution argument and defendant is entitled to dismissal with respect to the trademark dilution claim.

### III.   Plaintiff's Remaining Claims

Plaintiff's third and final federal law claim seeks a judicial declaration under the Declaratory Judgment Act clarifying the intellectual property rights of plaintiff and defendant respectively. Compl. ¶ 188. Defendant's principal argument for dismissing this claim is that plaintiff has not plausibly alleged an actual case or controversy under the Lanham Act, and a Declaratory Judgment Act claim cannot survive on its own without an alleged violation of a substantive federal law. Mot. 21. However, because the Court has concluded that plaintiff has sufficiently pled at least one Lanham Act claim, the Court declines to dismiss the Declaratory Judgment Act claim for lack of a case or controversy. *See Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554 F. Supp. 3d 448, 469 (E.D.N.Y.

2021) ("Because [p]laintiff sufficiently alleges [federal law] claims, the Court declines to dismiss [p]laintiff's claim under the Declaratory Judgment Act.")

Plaintiff's remaining claims are state law claims over which plaintiff asserts that the Court has supplemental jurisdiction. Defendant's only argument that these claims should be dismissed is that if the Court dismisses all of the federal law claims in the case, the Court would lack subject-matter jurisdiction over the remainder of the action. Mot. 19–20. Because the Court does not dismiss all of plaintiff's federal law claims, defendant's only argument for dismissing the state law claims is moot. *See Velez v. MedRite, LLC*, No. 24-cv-02707, 2025 WL 2650137, at *1 (S.D.N.Y. Sept. 15, 2025) ("Because one of the plaintiffs has pleaded a federal claim . . . and [p]laintiffs' state law claims are part of the same case or controversy and no circumstances justify declining to exercise jurisdiction, the Court has jurisdiction over [p]laintiffs' state law claims.").

**CONCLUSION**

For reasons set forth above, defendants' motion is **GRANTED** with respect to Count IV (Section 32 of the Lanham Act) and with respect to Count V (Section 43 of the Lanham Act) insofar as Count V raises a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B) and trademark dilution under 15 U.S.C. § 1125(c). Defendants' motion is **DENIED** with respect to the remaining claims. The case is respectfully referred to the magistrate judge for pretrial supervision.

**SO ORDERED.**

  _/s/ Natasha C. Merle_
NATASHA C. MERLE
United States District Judge

Dated:        December 16, 2025
              Brooklyn, New York